#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

#### BECKLEY DIVISION

| | |
|---|---|
| **MARSHA K. WILEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  **CIVIL ACTION NO. 5:05-0393** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the Court on cross-Motions for Judgment on the Pleadings. (Doc. Nos. 10, 12.) Both parties have consented in writing to a decision by the United States Magistrate Judge.

The Plaintiff, Marsha K. Wiley (hereinafter referred to as "Claimant"), filed an application for DIB on January 30, 2004 (protective filing date), alleging disability as of August 26, 2002, due to acute/severe strain to the upper neck, shoulder, and back; bilateral carpal tunnel syndrome; neuropathy in the legs; possible radiculopathy; weight gain; and labored breathing. (Tr. at 13, 57-59, 71.) The claims were denied initially and upon reconsideration. (Tr. at 35-37, 42-44.) On October 21, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 46.) The hearing was held on January 14, 2005, before the Honorable John T. Yeary. (Tr. at 336-77.) By decision dated March 24, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 12-22.) The ALJ's decision became the final decision of the Commissioner on April 26, 2005,

when the Appeals Council denied Claimant's request for review. (Tr. at 4-6.) Claimant filed the present action seeking judicial review of the administrative decision on May 6, 2005, pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 13.) Under the second inquiry, the ALJ found that Claimant suffered from strain of the cervical, thoracic, and lumbosacral spine, which the ALJ regarded as severe impairments. (Tr. at 17.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17.) The ALJ then found that Claimant had a residual functional capacity for light work with the following limitations:

> [C]laimant retains the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. She could sit six hours and stand and/or walk six hours during an eight-hour workday. She can occasionally use her upper extremities for pushing and/or pulling. She can occasionally balance, stoop, kneel, crouch, and climb ramps and stairs. She can never crawl or climb ladders, ramps or scaffolds. She can occasionally use her left dominant hand/arm for reaching in all directions, handling, fingering and feeling. She must avoid concentrated exposure to extreme cold, vibration and hazards. Also, she has mild to moderate pain but could be attentive to and carry out the assigned work tasks.

(Tr. at 18.) At step four, the ALJ found that Claimant was unable to return to her past relevant work. (Tr. at 19.) Nonetheless, at the fifth inquiry, the ALJ determined, on the basis of Vocational Expert (VE) testimony, that Claimant could perform light level jobs such as a vacuum tester, a flagger, and a gatekeeper, and sedentary level jobs such as a telephone quotation clerk, a dispatcher, and an information clerk. (Tr. at 20.) On this basis, benefits were denied. (Tr. at 21-22.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on June 8, 1956, and was 48 years old at the time of the administrative hearing. (Tr. at 19, 57, 341.) Claimant had a high school education. (Tr. at 13, 19, 77, 344.) In the past, Claimant worked as a cashier/checker, stock clerk, cashier II, receptionist, and price marker. (Tr. at 13, 80-86, 344-49, 369-70.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence of record and will discuss it further below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not according great weight to the opinions and residual functional capacity assessment of her treating physician, Manuel B. Villanueva, M.D. (Pl.'s Br. at 3, 11-12.) Specifically, Claimant argues that the ALJ failed to analyze Dr. Villanueva's opinions according to the Regulations because he did not mention the length of the treatment relationship, the extent of treatment, or the specialization of the other physicians who provided opinions on Claimant's residual functional capacity. (Pl.'s Br. at 12.) The Commissioner asserts that these arguments are without merit and that substantial evidence supports the ALJ's decision. (Def.'s Br. at 12-17.)

Analysis

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2) (2004). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(d)(2) (2004). Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (S.S.A.), reiterates the standard for considering medical opinions of treating sources stating when the ALJ must adopt the opinions of treating sources on the issue(s) of the nature and severity of claimants' impairments as follows:

5

> The [regulatory] provision recognizes the deference to which a treating source's medical opinion should be entitled. It does not permit us to substitute our own judgment for the opinion of a treating source on the issue(s) of the nature and severity of an impairment when the treating source has offered a medical opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.

According to SSR 96-2p, the medical opinions of treating sources must be given controlling weight when they meet four factors: (1) they must be opinions of "treating sources"; (2) they must be "medical opinions", i.e., opinions about the nature and severity of claimants' impairments; (3) the ALJ must find them "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques; and (4) even if well-supported, the opinions must be "not inconsistent" with the other "substantial evidence" in the individual's case record. SSR 96-2p states further as follows:

> It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do. Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not.

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Generally speaking with respect to medical opinions, the ALJ gives more weight to opinions of treating physicians than to those of examining and non-examining physicians. 20 C.F.R. § 404.1527. As between the opinions of examining and non-examining physicians, the ALJ will

6

generally give more weight to the opinion of examining physicians. 20 C.F.R. § 404.1527(d)(1). Opinions of medical experts are accorded the same treatment as that given non-examining sources. 20 C.F.R. § 1527(f)(2)(iii).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2)(2004).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2004). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

The record indicates that Claimant sought treatment from Dr. Villanueva from September 10, 2002, through at least December 17, 2004. (Tr. at 194-220, 300-11, 327-31, 332-35.) On September 10, 2002, Dr. Villanueva examined Claimant upon complaints of a work injury to her neck, arm, and shoulder blade. (Tr. at 217.) Claimant complained of neck pain, swelling of the neck, headaches, and the inability to raise her arm. (Tr. at 215-17.) Dr. Villanueva referred Claimant to a physical therapist, where she initiated treatment on September 24, 2002. (Tr. at 192.) On September 16, 2002, three weeks after her injury, x-rays of her cervical and thoracic spine were normal. (Tr. at 218-19.) An MRI scan of Claimant's cervical spine on December 21, 2002, was also normal. (Tr. at 143.) On March 13, 2003, Dr. Villanueva diagnosed Claimant as having neck and upper back strain with

muscle spasms and possible left radiculopathy. (Tr. at 206, 208.) On May 14, 2003, Claimant reported that her headaches occurred less frequently and an improvement in her pain level. (Tr. at 207.) In a letter to Workers' Compensation, dated May 30, 2003, Dr. Villanueva stated that Claimant could "try to return to work." (Tr. at 206.)

On July 15, 2003, Claimant experienced uncontrollable tremors in her left hand. (Tr. at 202.) On September 17, 2003, Dr. Villanueva noted that Claimant's headaches were somewhat milder and occurred less frequently. (Tr. at 199.) However, on October 13, 2003, Dr. Villanueva noted Claimant's complaints of shoulder and low back pain which radiated to her hip and daily numbness of her foot. (Tr. at 197.) He opined that she was unable to return to work as she had not yet reached maximum medical improvement. (Id.) EMG and nerve conduction studies, conducted by Joe O. Othman, M.D., Neurologist, on October 9, 2003, revealed bilateral carpal tunnel syndrome, slightly worse on the left than the right side. (Tr. at 159-60.) On October 31, 2003, Claimant was released from physical therapy and was instructed to follow a home program of exercises. (Tr. at 161.)

An MRI scan of Claimant's lumbar spine on January 11, 2004, was normal. (Tr. at 221.) Nevertheless, Claimant returned to Dr. Villanueva on March 8, 2004, with complaints of low back pain and numbness of her right foot. (Tr. at 307.) On examination, Dr. Villanueva noted tenderness in the lumbar and para-lumbar areas, low back pain on bending and decreased ranges of motion of her low back, decreased sensation of the right foot, negative straight leg raise on the left, and positive straight leg raise on the right at 45 degrees. (Tr. at 307.) On May 18, 2004, Dr. Villanueva diagnosed Claimant as having "an acute exacerbation of a chronic sprain/strain type of low back injury associated with right lower extremity neuropathy." (Tr. at 307.) Dr. Villanueva continued Claimant's medications of Lortab, Flexeril, Mobic, Neurontin, and Elavil, primarily for neck and upper back

8

problems, and recommended that she receive epidural injections at a pain clinic. (Tr. at 307.) He also suggested an orthopedic consultation "for further evaluation and management, mainly if other modalities of treatment could further benefit the patient at this time." (Tr. at 307.) Dr. Villanueva noted that the epidural injections seemed to help, although Claimant continued to complain of low back pain. (Tr. at 310.) A second MRI scan of Claimant's lumbar spine on July 25, 2004, revealed fatty bone marrow changes in the T12 vertebra, but no disc herniation or central canal and lateral recess stenosis. (Tr. at 299.)

On October 26, 2004, Dr. Villanueva completed a Medical Assessment of Ability to do Work-Related Activities (Physical), in which he opined that Claimant was incapable of performing sedentary work. (Tr. at 16, 332-35.) Dr. Villanueva opined that Claimant could lift and carry less than ten pounds, stand and walk less than thirty minutes, could occasionally balance and stoop, but could never climb, crouch, kneel, or crawl. (Tr. at 332-33.) He further opined that her ability to reach, handle, feel, push, or pull was limited by her impairment due to experiencing numbness and weakness in her extremities. (Tr. at 334.) Finally, Dr. Villanueva opined that Claimant should avoid temperature extremes due to her arthritis. (Tr. at 334.) Dr. Villanueva stated that his opinions were based on Claimant's pain, numbness, weakness, and muscle spasms resulting from a chronic sprain/strain of the neck, thoracic, and lumbosacral spine, with left upper extremity and right lower extremity radiculopathy, and bilateral carpal tunnel syndrome, which was more severe on the left side than the right. (Tr. at 332.)

The ALJ noted Dr. Villanueva's treatment of Claimant and his opinions as to Claimant's RFC, but afforded the opinions "little weight" because they were not "well-supported," "adequately explained," or consistent with his own treatment notes. (Tr. at 16.) Claimant argues that the ALJ

failed to analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(d)(2)-(6). Specifically, she argues that the ALJ failed to analyze the length of Claimant's treatment relationship with Dr. Villanueva, the extent of treatment, and the specialization of the physicians who provided opinions on Claimant's functional capacity.

The Court finds that although the ALJ did not cite the specific factors enumerated in 20 C.F.R. § 404.1527(d)(2), he nevertheless addressed the factors in the body of his opinion. Concerning the length of treatment, the ALJ noted that Claimant began treatment with Dr. Villanueva in September, 2002, approximately two weeks after her injury, and continued treatment with him through at least October, 2004, when he completed his assessment. (Tr. at 14-16.) With respect to the nature and extent of the treatment relationship, as discussed above, the ALJ summarized Claimant's complaints; Dr. Villanueva's diagnoses, treatment, and recommendations for further treatment; and the x-rays and MRIs ordered by Dr. Villanueva. Concerning the fifth factor, although the ALJ did not explicitly state that Drs. Shamblin, Forberg, and Ambroz were specialists, the record clearly indicates that Dr. Shamblin specializes in orthopedics (Tr. at 142.), that Dr. Forberg is certified by the American Board of Orthopedic Surgery (Tr. at 154.), and that Dr. Ambroz is certified by the Board of Occupational Medicine. (Tr. at 320.) The ALJ considered the third and fourth factors and concluded that Dr. Villanueva's October, 2004, opinions were inconsistent with his treatment notes and were neither well-supported by the medical evidence of record, nor adequately explained.

The Court finds that the ALJ's conclusion that Dr. Villanueva's October, 2004, opinions were not adequately explained is supported by substantial evidence. During the administrative hearing, the VE noted that Dr. Villanueva's medical assessment was "not complete enough or thorough enough to really be able to even make a good vocational opinion of it." (Tr. at 375.) Nevertheless, the VE

surmised that Claimant was limited to performing less than a full range of sedentary work. (Tr. at 375.) Furthermore, based on the limited objective evidence cited in Dr. Villanueva's treatment notes and the absence of the other medical evidence as discussed below, the Court finds it difficult to determine how Dr. Villanueva formed his opinions. Accordingly, substantial evidence supports the ALJ's finding that Dr. Villanueva's October, 2004, opinions were not adequately explained.

The Court next addresses the ALJ's finding that Dr. Villanueva's opinions were not well-supported by the medical evidence, which the ALJ summarized in his opinion. The other medical evidence of record indicates that on May 22, 2003, Claimant was referred to David C. Shamblin, M.D., an orthopedist. (Tr. at 143-44.) Dr. Shamblin noted that Claimant's condition had improved with physical therapy as she was able to get her arms over her head. (Tr. at 143.) Prior to therapy, she was unable to reach overhead with her left arm to place dishes in a cabinet. (Id.) On exam, Dr. Shamblin observed decreased neck flexion and extension; left shoulder tenderness, but complete range of motion; tenderness over the right sacroiliac region; full range of motion of her back; ability to heel and toe rise without difficulty; normal motor strength, sensation, and reflexes in all extremities; and mild Tinel's sign in both wrists. (Id.) Dr. Shamblin diagnosed severe cervical strain primarily affecting Claimant's left shoulder. (Id.) He recommended that she continue use of Mobic, Neurontin, and possibly hydrocodone, continue physical therapy, and use a hot oil pack between sessions, and consider trigger point injections. (Id.) Dr. Shamblin stated that Claimant had "turned the corner and . . . anticipate[d] that she w[ould] come close to normal function within the next two months." (Id.)

On August 13, 2003, Claimant underwent an orthopedic evaluation by Paul K. Forberg, M.D. (Tr. at 146-58.) Dr. Forberg noted Claimant's complaints of head, neck, and shoulder pain, and her

statements that she experienced daily headaches and pain in her neck and shoulder with flexion and extension. (Tr. at 147.) On exam, Dr. Forberg observed decreased range of cervical motion with pain in the cervicothoracic area with motion, but with no tenderness, muscle spasm, crepitus, or radiating pain. (Tr. at 150.) He also observed decreased shoulder abduction and forward flexion bilaterally but no tenderness, muscle spasm, crepitus, or radiating pain. (Id.) His exam further revealed normal ranges of motion and findings of Claimant's elbows, forearms, wrists, and hands; negative Tinel's sign over the median nerves of the wrists and ulnar nerves of the elbows; and decreased tendon reflexes in her upper extremities. (Tr. at 150-51.) Dr. Forberg diagnosed cervicothoracic spine strain, secondary muscle contraction tension headaches, limited range of shoulder motion due to cervicothoracic pain, hypertension, and obesity. (Tr. at 152.) He issued an objectively good prognosis and indicated that no further treatment was needed "based upon objective physical findings and positive diagnostic tests." (Id.) Dr. Forberg concluded that Claimant had reached maximum medical improvement and could return to work on a modified assignment. (Tr. at 152-53.)

Pursuant to Dr. Villanueva's referral, Claimant underwent treatment at the Appalachian Pain Therapy Institute from December 15, 2003, through July 14, 2004, for neck and upper body pain. (Tr. at 259-69, 298.) On December 15, 2003, Oai L. Smythe, M.D., diagnosed persistent cervical strain, developing chronic pain syndrome, and suggestion of left shoulder and scapular pain, focal or radicular. (Tr. at 268.) On March 2, 2004, G. Montgomery Baylor, M.D., diagnosed cervical spondylosis without myelopathy and administered a cervical epidural injection. (Tr. at 266.) On April 1, 2004, Dr. Baylor diagnosed cervical radiculagia and administered a second cervical epidural injection. (Tr. at 264.) Dr. Baylor noted on April 22, 2004, that Claimant sustained 40% relief of her pain following the epidural injections and that she experienced some relief in pain from her

medications, heat, and massage. (Tr. at 262.) On exam, Dr. Baylor observed negative straight leg raising test, Lasegue's test, Patrick's test, and normal neurological findings in all extremities. (Tr. at 262.) He diagnosed lumbar radiculalgia pursuant to Claimant's complaints of back pain. (Id.)

On May 26, 2004, Dr. Smythe administered trigger point injections to Claimant's left shoulder, which provided modest relief. (Tr. at 259, 261.) On June 24, 2004, J.K. Lilly, M.D., M.S., administered a lumbar epidural steroid injection. (Tr. at 259.) Finally, on July 14, 2004, Dr. Lilly administered a right tranforaminal epidural steroid injection. (Tr. at 298.)

On April 10, 2004, Claimant underwent a consultative examination by Eugene Evans, D.O. (Tr. at 245-49.) Claimant reported that she experienced pain in her neck, left shoulder, and lower back, and that a heating pad, medications, and physical therapy provided some relief. (Tr. at 245.) She stated that her condition was worse with activity, in cold and damp weather, and when bending her head forward. (Id.) Claimant also reported constant pain in her low back which radiated to her right hip and buttock, with occasional numbness in the right foot. (Id.) She stated that a heating pad and pillow between her legs provided some relief, while her condition was worsened with standing, sitting, and driving. (Id.) Dr. Evans' physical exam revealed a normal, slow gait without use of assistive devices; the ability to heel-toe walk without difficulty; the ability to squat half way and arise; normal ranges of motion in all areas; 5/5 muscle and grip strengths; negative straight leg raises in the supine and sitting positions; normal deep tendon reflexes; a normal motor and sensory exam; normal gross and dexterous motion of the hands and peripheral pulses; some tenderness to palpation in the paravertebral musculature of the cervical spine, with the left side more tender than the right; tenderness in the left shoulder area in the lumbosacral spine, with the right side more tender than the left; and tenderness in the right sacroiliac joint. (Tr. at 246, 248-49.) Dr. Evans opined that Claimant

"would be able to do certain work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling at least on a light to moderate duty basis." (Tr. at 247.) He also suggested that some of Claimant's neck and back pain would be alleviated with some weight loss. (Id.)

On October 25, 2005, Claimant underwent a consultative examination by Alex Ambroz, M.D. (Tr. at 312-26.) On exam, Dr. Ambroz observed a decreased range of neck motion and paravertebral spasms; a full range of motion of Claimant's arms, elbows, wrists, hands, knees, hips, ankles, and feet; no hand atrophy; ability to make a fist; normal deep tendon reflexes; lumbar hyperlordosis and back tenderness at L2-L5; bilateral paraspinal muscle tenderness and muscle spasm; sacroiliac joint tenderness bilaterally; diminished sensation to pin prick on right at L3-S1; pain in lower back on straight leg raise while seated and in supine position; 4.5/5 muscle strength due to pain; ability to walk on heels and toes without difficulty or pain; inability to squat and rise; and an antalgic gait. (Tr. at 317-18.) Dr. Ambroz diagnosed chronic cervical and lumbar sprain, obesity, chronic pain syndrome, hypertension, and depression. (Tr. at 319.) He opined that Claimant had reached maximum medical improvement and recommended that she continue with conservative care for her neck and back problems. (Id.) Dr. Ambroz further opined that Claimant would not benefit from further diagnostic or therapeutic procedures. (Id.)

The record also contains the Physical Residual Functional Capacity Assessments of two state agency physicians, Uma P. Reddy, M.D. (Tr. at 250-58.) and Marcel Lambrechts, M.D. (Tr. at 270-78.) On April 20, 2004, Dr. Reddy opined that Claimant had no significant limitations or severe physical impairments. (Tr. at 255, 57.) On August 16, 2004, Dr. Lambrechts concluded that Claimant could perform light work with occasional limitations of climbing, balancing, stooping, kneeling,

crouching, and crawling. (Tr. at 271-72.) He found that Claimant had a limited ability to handle, finger, and feel; had an unlimited ability to reach; should avoid concentrated exposure to extreme cold and hazards; and should avoid even moderate exposure to vibration. (Tr. at 273-74.) Dr. Lambrechts further found that Claimant's symptoms were credible, but magnified. (Tr. at 275.)

Based on the foregoing, the Court finds that Dr. Villanueva's October, 2004, opinions are not supported by substantial evidence. As the Commissioner notes, although Dr. Villanueva's treatment notes reflect Claimant's complaints of pain, they are not indicative of objective medical evidence supporting a finding of disability. The x-rays of Claimant's cervical and thoracic spine taken three weeks after her workplace injury were normal. (Tr. at 219.) Additionally, the MRI scans of Claimant's lumbar and thoracic spine conducted in December, 2002, and January and July, 2004, both revealed no significant findings. (Tr. at 221, 299.) The physical findings of the several specialists who examined Claimant and the state agency physicians' opinions support the ALJ's finding that Claimant is capable of performing work at the light level of exertion. These findings and opinions demonstrate that Claimant's physical conditions improved with physical therapy, injections, and medications and that other than minimal decreased ranges of motion, she exhibited no signs which would prohibit her from performing light level work. It is not within the province of this Court to re-weigh the evidence of record; rather, the Court must review the evidence to determine whether the ALJ's decision is supported by substantial evidence. The Court finds based upon a thorough review of the record that the ALJ's analysis and weighing of the opinions of the medical sources is fully in conformity with the applicable law and Regulations. Accordingly, the ALJ's determination to give little or no weight to the October, 2004, opinions of Dr. Villanueva is supported by substantial evidence; Claimant's assertions to the contrary are without merit.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is **DENIED**, Defendant's Motion for Judgment on the Pleadings is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

ENTER: September 1, 2006.

R. Clarke VanDervort
United States Magistrate Judge